IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SPRINGLEAF FINANCIAL SERVICES OF ALABAMA, INC. f/d/b/a AMERICAN GENERAL FINANCIAL SERVICES OF ALABAMA, INC., | : | |
| Plaintiff, | : | |
| v. | : | CA 12-00579-C |
| THE F/V WHITEWATER, her engines tackle, boilers, furniture, appurtenances, etc., IMO Number: MYN47004M81H, *in rem*; JOHN M. FRANCIS; MARY G. FRANCIS; and JOHN M. FRANCIS, II, | : : : | *IN REM* |
| Defendants. | : | |

**ORDER**

On November 7, 2012, on the motion of the plaintiff (*see* Docs. 4-11), Eastern Shore Marine, Inc. ("ESM") was appointed substitute custodian for the vessel upon its arrest by the United States Marshal (Doc. 12). While the vessel was in ESM's custody, the plaintiff and the defendants settled their dispute, and, on April 8, 2013, informed the Court that they had "reached an agreement as to the disposition of the case with some minor details to be worked out" (Doc. 31), which prompted the Court to issue, the next day, a "30-day order," dismissing this action with prejudice, but providing for its reinstatement within thirty days if the settlement agreement or other appropriate settlement documentation was not consummated in the interim (Doc. 32). Shortly thereafter, on April 15, 2013, ESM filed the motion (Doc. 33) now before the Court, requesting that dismissal be set aside and that it be paid in full for the custodial fees

already invoiced and still accruing.[1]   The parties have filed a joint response objecting to the amount of fees ESM requests and proposing an alternative amount to the Court (Doc. 37), and ESM has filed a second brief in support (construed as a reply) and provided supplemental evidence in support of its position (Docs. 38, 39).  After the Court determined the briefing necessitated the need for an evidentiary hearing, the 30-day order was vacated and the case reinstated.  (*See* Doc. 40.)  An evidentiary hearing occurred June 10, 2013.  (*See* Doc. 43.)  At the hearing, Ed Wall, president of ESM, testified, and the Court heard argument from all parties.

For the reasons explained in this order, ESM's motion for custodial fees (Doc. 33) is **GRANTED**.

## I. Magistrate Judge Jurisdiction.

This case, filed September 10, 2012, has been proceeding before the undersigned United States Magistrate Judge with the implicit consent of the plaintiff and the defendants.  (*See* Doc. 3, notice of assignment to Magistrate Judge for all purposes, including trial, entered Sept. 12, 2012.)  Prior to the substitute custodian's motion requesting that the Court's 30-day order be set aside, the undersigned had ordered the arrest of the vessel and the appointment of the substitute custodian; managed this case, including prompting the parties (albeit absent the substitute custodian) to meet and negotiate a settlement of this matter; and entered the 30-day order after notification of settlement.  Thus, leading up to the substitute custodian's motion, at least the plaintiff

---

[1]   *See, e.g., id.*, ¶ 10 ("The total unpaid principal and interest for custodial charges and removal of water as of the most recent invoice, which covered through April 9, 2013, is $7953.66.  Additional charges for custodial fees are continuing to accrue as of April 10, 2013 at $94 per day, and will continue through the date of the release of ESM as Substitute Custodian of the F/V WHITEWATER under order of this Court.").

2

and the defendants had "continual[ly] participat[ed] in pretrial proceedings [for an extended period of time to] justif[y] the inference of consent from [ ] litigant[s] aware of the need to consent."  *Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1350-51 (11th Cir. 2007); *see also Roell v. Withrow*, 538 U.S. 580, 590 (2003) (Inferring consent "where, as here, the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the Magistrate Judge . . . checks the risk of gamesmanship by depriving parties of the luxury of waiting for the outcome before denying the magistrate judge's authority.   Judicial efficiency is served; the Article III right is substantially honored.")

Implicit consent notwithstanding, at the June 10, 2013 evidentiary hearing, the undersigned discussed the jurisdictional issue with the parties and obtained on the record the express consent of all parties: the plaintiff, the defendants, and the substitute custodian.

## II.     *In Custodia Legis* **Standard.**

"In order to qualify for preferential treatment as an expense *in custodia legis*, an expense must be incurred 'upon the authority of the court or its officer,' and be 'for the common benefit of those interested in [the] fund.'"  *Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 176, 182 (3d Cir. 1993) (quoting *Kingstate Oil v. M/V GREEN STAR*, 815 F.2d 918, 922-24 (3d Cir. 1987) (quoting, in turn, *New York Dock Co. v. S.S. POZNAN*, 274 U.S. 117, 121 (1927))); *see Fortis Bank (Nederland) N.V. v. M/V SHAMROCK*, 379 F. Supp. 2d 2, 7-8 (D. Me. 2005) (same); *see also Dresdner Bank AG v. M/V OLYMPIA VOYAGER*, 465 F.3d 1267, 1272 (11th Cir. 2006) ("Steamship is not entitled, under the doctrine of *custodia legis*, to equitable prioritization of its claim for

the value of insurance it provided to the vessel after its arrest because it did not first seek or receive the district court's permission to provide such insurance[.]").

While the Eleventh Circuit has remarked that "those furnishing custodial services to a ship *in custodia legis* are gambling on a wholly unpredictable result unless they take the precaution of having their services authorized in advance of any order of the custodial court[,]" *Dresdner Bank*, 465 F.3d at 1273 (quoting *Bassis v. Universal Line, S. A.*, 484 F.2d 1065, 1068 (2d Cir. 1973)), ESM's appointment by this Court as the substitute custodian enables it to seek the recoupment of expenses it incurred while performing that role. *See General Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration*, 668 F.2d 811, 816 (5th Cir. 1982) ("[S]ervices or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court *or of an officer of the court* (here, the keeper²) **acting within his authority**, should be allowed as a *custodia legis* expense.") (citations omitted and footnote and emphasis added); *see also Turner v. Neptune Towing & Recovery, Inc.*, No. 8:09–CV–1071–T–27AEP, 2011 WL 4542265, at *10 (M.D. Fla. Sep. 23, 2011) ("Neptune is [ ] entitled to recover the **reasonable** expenses it has incurred as substitute custodian.") (citing *Drill Ship Mission Exploration*) (emphasis added); *Absolute Marine Towing & Salvage, Inc. v. S/V INIKI*, No. 6:09–cv–1712–Orl–31KRS, 2011 WL 2183054, at *1 (M.D. Fla. May 18, 2011) (report of the Magistrate Judge recommending that the unopposed motion for taxation of substitute custodial fees against defendant vessel *in rem* be granted) (citing *Drill Ship Mission*

---

² The appointment of a substitute custodian is an alternative to placing aboard a vessel a keeper under the Marshal's surveillance. *Donald D. Forsht Assocs., Inc. v. Transamerica ICS, Inc.*, 821 F.2d 1556, 1560 (11th Cir. 1987).

4

*Exploration*).³

ESM, as the party seeking to collect costs *in custodia legis*, bears the "burden of proving that [its] costs were equitably incurred." *Horizon Shipbuilding Inc. v. Blyn II Holding LLC*, Civil Action No. C–12–60, 2012 WL 2911918, at *11 (S.D. Tex. July 16, 2012) (quoting *National Bank of N. Am. v. S.S. Oceanic Ondine*, 315 F. Supp. 386, 388 (S.D. Tex. 1970)); *compare id.*, *with The Ponzan*, 274 U.S. at 121–22 ("The court of admiralty is asked, in the exercise of its admiralty jurisdiction, to administer the fund within its custody in accordance with equitable principles as is its wont. It is defraying from the proceeds of the ship in its registry an expense which it has permitted for the common benefit and which, in equity and good conscience, should be satisfied before the libelants may enjoy the fruit of their liens.") And, in order for the Court to give priority to the expenses claimed by ESM as "expense[s] of justice," ESM must establish that those expenses were incurred "for the common benefit of [all] interested [parties.]" *The Poznan*, 274 U.S. at 121 (citation and internal quotation marks omitted); *see also Dresdner Bank*, 465 F.3d at 1272-73 *(*"[C]laims for necessaries provided to a ship after its arrest 'are paid as

---

³ Although no party has asserted that the vessel was damaged while is ESM's care, it should be stated

> that the duty owed by a substitute custodian involves the same well-established standard of care that pertains to the United States Marshal: to keep the property in a safe and secure manner, so as to protect it from injury so that its value to the parties will not be impaired by unnecessary deterioration or damage.

*Horizon Shipbuilding Inc. v. Blyn II Holding LLC*, Civil Action No. C–12–60, 2012 WL 2911918, at *4 (S.D. Tex. July 16, 2012) (citing *Material Serv. & Transp. Co. v. Schneider*, 129 F.2d 392, 394 (3d Cir. 1942)). This amounts to "'reasonable care under the circumstances.'" *Id.* (citing *Scotiabank De Puerto Rico v. M/V ATUTI*, 326 F. Supp. 2d 282, 284 (D.P.R. 2004); *New River Yachting Center, Inc. v. M/V Little Eagle II*, 401 F. Supp. 132, 135–36 (S.D. Fla. 1975)). Thus, the substitute custodian "is not charged with preventing normal wear and tear or depreciation. Neither is it responsible to continue repairs or to make improvements." *Id.* (citing *Scotiabank*, 326 F. Supp. 2d at 285).

"expenses of justice" in priority to all lien claims when the dictates of "equity and good conscious" so require.'") (quoting *Donald D. Forsht Assocs.*, 821 F.2d at 1561); *Oil Shipping (Bunkering) B.V. v. Royal Bank of Scotland plc*, 817 F. Supp. 1254, 1260 n.8 (E.D. Pa. 1993) ("[T]he ability of the substitute custodian to incur administrative expenses is limited to legitimate expenses that benefit all the interested parties and are necessary for the due care and preservation of the vessel.") (citations omitted).

### III.    Discussion.

#### A.    Background.

Counsel for the plaintiff requested that the Court appoint ESM as substitute custodian for the vessel.  (*See* Doc. 7.)   And the objection to ESM's motion provides the following background:

> Plaintiff's counsel spoke with Mr. Ed Wall prior to the arrest of the vessel. There was no meeting of the minds as to what a reasonable custodian's charge would be.  Plaintiff's counsel, having no prior experience in the arrest of a vessel, had no frame of reference as to what a reasonable *custodia legis* charge might be.  Plaintiff's counsel expected the charge to be reasonable in light of Plaintiff's mortgage contract with the Defendants stating such charges would be recouped from the sale proceeds in the event of a judicial sale of the vessel.  Plaintiff's counsel anticipated that under the law, any claim for custodial fees would ultimately be assessed by the Court based upon what the Court deemed reasonable in light of the proceeds realized from the sale of the vessel.  Plaintiff's counsel did not understand that the custodian's charge would be several times more than the existing monthly charge for dry storage of the *Whitewater*.

(Doc. 37 at 2-3.)

ESM objects to the parties' characterization of the understanding between the plaintiff's counsel and ESM.  In its motion, ESM avers that it "undertook to act as Substitute Custodian based on an agreement with plaintiff's counsel that custodial fees would be $2.00 per foot per day for the 47-foot [vessel], which was then in the

possession of ESM, and that ESM would bill plaintiff's counsel weekly for custodial fees and receive prompt payment." (Doc. 33 at 2.) ESM further provides that the plaintiff's counsel failed to complain or protest to multiple invoices requesting this $94.00 per day rate. (*See id.* at 2-3; Doc. 38 at 3; *e.g.*, Doc. 39, Ed Wall aff., ¶ 4 ("I [ ] proposed the rate of $2 per foot per day to Plaintiff's counsel before agreeing to act as custodian. Plaintiff's counsel agreed to this rate. He did not ask any questions about the basis for this rate, and he did not propose a smaller amount. He unconditionally agreed to it. . . .").)

The submissions of ESM and the parties further reveal that the vessel "has been in dry dock at ESM since at least October of 2012." (Doc. 37 at 7; *see also* Doc. 37-1, J. Michael Francis, II aff., ¶¶ 2, 3.) Mr. Wall testified at the evidentiary hearing that the vessel was brought to ESM for repairs and placed in dry dock for that purpose. He further testified that ESM began repairing the vessel, but creased making repairs to the vessel once it became apparent that ESM would not continue to be paid for its work. Prior to the vessel being arrested on November 14, 2012, ESM had, occurring to Wall's testimony, collected between $6,000 and $7,000 for repairs to the vessel and, according to Mr. Francis, "was charging $360.00 per month for storage fees for the *Whitewater*." (Doc. 37-1, ¶ 6; *see also id.* at 4.)

    Further, according to Mr. Francis's affidavit,

the arrest of the vessel did nothing more than change the vessel's status; the arrest did not alter the physical location or even the physical condition of the vessel (such as moving the vessel from wet to dry dock). Yet, the moment the vessel was arrested and ESM became Substitute Custodian, ESM began charging a rate that is more than 7 times higher than the rate it had been charging for dry storage of the *Whitewater*.

7

(Doc. 37 at 7; *see also* Doc. 37-1, ¶¶ 4-7.)  Mr. Wall testified, however, that the lower initial storage fee was being charged for the vessel because ESM could offset that lower amount by performing repairs to the vessel.[4]  According to Wall, once ESM assumed its role as substitute custodian, the higher storage rate became necessary, at least in part, because ESM was no longer able to generate revenue by performing repairs to the vessel.[5]  Finally, Mr. Wall testified that, one, for almost the entire time ESM has served as the substitute custodian for the vessel, ESM has had a waiting list for boats that needed to be pulled out of the water and repaired at ESM and, two, ESM did not have an available slip in which to store the vessel in the water.  Thus, Wall's unrefuted testimony established that ESM gave up business (repairing vessels in the dry dock spot occupied by the *Whitewater*) in exchange for its custodial fees.

  **B.**  **Analysis.**

The plaintiff and the defendants rely extensively on this Court's custodial fees decision in *Oliver v. M/V BARBARY COAST*, No. CA 11–223–KD–C, 2012 WL 869387 (S.D. Ala. Feb. 27, 2012), *report & recommendation adopted*, 2012 WL 832846 (S.D. Ala. Mar. 13, 2012), to argue that the $2.00 per foot daily rate—ESM and the plaintiff's counsel agreed to before the arrest of the vessel—is exorbitant considering the status of this vessel did not change once it was under arrest.  And the plaintiff and the defendants, again relying on *Barbary Coast*, contend that a reasonable custodial fee for

---

  [4]  Mr. Wall testified that repair work for a vessel occupying the same spot at ESM as the *Whitewater* could net ESM $100 per day.

  [5]  *E.g., Horizon Shipbuilding*, 2012 WL 2911918, at *4 (the substitute custodian's duty of "reasonable care under the circumstances" means that it is not "responsible to continue repairs or to make improvements" to the vessel).

8

this vessel is $44 per day (or $0.93 per foot per day, which is the per day rate the undersigned determined was reasonable in *Barbary Coast*).

This case is, however, factually distinguishable from *Barbary Coast*. For instance, baked into the requested $250 per day custodial fee in that case was a litany of actions the substitute custodian claimed he took to ensure the safety of the vessel that the Court determined where not necessarily "necessary for the due care and preservation of the vessel."[6] And, there, the Court held that

> "[b]ecause storage/wharfage of a vessel by the Court-appointed substitute custodian is generally 'necessary for the due care and preservation of the vessel,' *Oil Shipping (Bunkering) B.V.*, 817 F. Supp. at 1260 n.8, it is an expense incurred 'for the common benefit of [all] interested [parties,]' *The Poznan*, 274 U.S. at 121. The evidence presented . . . , however, [did] not show that $250 per day [to be] a legitimate rate for the services this substitute custodian provided in [that] regard. *See Oil Shipping (Bunkering) B.V.*, 817 F. Supp. at 1260 n.8 ("[T]he ability of the

---

[6] There, the undersigned noted:

In connection with its assumption of responsibility for the vessel, Mr. Oliver testified that Southern took daily actions over and above what it would have done for a vessel that was merely moored at its facility. He testified that '[t]o ensure the safe mooring of the vessel, [he] sank two additional pilings for its moorings' on April 8, 2011. (Dec. 2, 2011 Oliver Aff., ¶ 5.) He further

> inspected the bilge and moorings at a minimum two times per day and kept a log of such. [He] also oversaw other work performed on the vessel, such as the instillation of a high water alarm; instillation of a fire alarm system[. And he] added additional lines to the moorings that were the property of Southern; inventoried the vessel; worked with the Coast Guard regarding the vessel; initiated and oversaw the pumping of the bilge; deployed boom, recovered boom and cleaned boom around the vessel; developed an evacuation plan in case of a hurricane; kept unauthorized persons off the vessel; and spent more than one night at the marina during inclement weather to ensure the vessel was secure. Finally, [he] incurred attorney's fees for the various filings and hearings associated with being Substitute Custodian.

(*Id.*, ¶ 6.)

2012 WL 832846, at *2-3 (modified and footnote omitted).

>   substitute custodian to incur administrative expenses is *limited to legitimate expenses*[.]") (emphasis added).

2012 WL 832846, at *3; *see also id.* (concluding, "Based on the evidence presented, the undersigned finds a rate of $60 per day to be legitimate, and thus the substitute custodian should be awarded $7,800 for the 130 days the M/V BARBARY COAST was stored/wharfed at Southern. The $60 daily rate takes into consideration, primarily, the testimony of Mr. Collier and the fact that while Southern did not have to incur the expense of hiring a night watchman, according to his testimony, Mr. Oliver spent more than one night at the marina during inclement weather to ensure the vessel was secure.").

Here, it has not been refuted that the counsel for the party arresting the vessel agreed on the substitute custodian's daily rate prior to arrest of the vessel. That rate was also paid for a period of time. And neither the plaintiff nor the defendants have alleged that the substitute custodian here "padded" his rate for storing the vessel by performing tasks not necessarily "necessary for the due care and preservation of the vessel." Thus, where the per day charge is not unreasonable under the circumstances, *as is the case here*,[7] it does not matter that the plaintiff's counsel, "having no prior experience in the arrest of a vessel, had no frame of reference as to what a reasonable *custodia legis* charge might be" or what counsel expected or anticipated. The rate was agreed to, and it was reasonable. As such, the Court has no business using its equitable powers to rescue the parties from their contract.

---

[7] Mr. Wall's unrefuted testimony regarding the economics of his marina sufficiently negated the seemingly questionable fact that the rate to store the vessel was jacked up significantly once it was under arrest.

Here, moreover, the plaintiff and the defendants did nothing to mitigate the costs associated with having the vessel remain under arrest and in the custody of the substitute custodian. For example, Supplemental Admiralty Rule E(5)(a)

> governs the procedure for releasing the vessel on bond. Rule E(5)(a) provides that whenever "a maritime attachment is issued, the execution of such process shall be stayed, and the property released, on the giving of security to be approved by the Court of Clerk." In the event that the parties cannot agree on the amount of the bond, the Rule adds:
>
>> the Court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisment, whichever is smaller.

*Julien v. M/V Pacific II*, No. 09–22457–CIV, 2010 WL 1850359, at *1 (S.D. Fla. May 7, 2010). Further, while Rule E(5)(a) "does not offer guidance as to the amount that the Court must set[, t]he Court clearly has discretion in this regard to determine what the 'reasonable value' of this claim is." *Id.* (citations omitted); *accord S & S Diesel Marine Servs., Inc. v. M/V F-TROOP*, No. 11–60020–CIV, 2011 WL 1899402, at *13 (S.D. Fla. May 18, 2011).[8] Thus, given the relatively small amount-in-controversy (*see* Doc. 1, compl.,

---

[8] There, the court noted that, based on applicable equitable principles, it had some discretion to determine the amount of the bond:

> In the absence of the concern for limiting a plaintiff's ultimate recovery, this Court sees no reason for blindly accepting the contractual amount as the default amount of the bond, even if it is not "blatantly overstated." To the contrary, the language of Supplemental Admiralty Rule E(5)(a) specifically obliges the Court to determine the "amount of the plaintiff's claim *fairly* stated . . ." (emphasis added). Moreover, while an admiralty court is not a court of equity, it nonetheless "proceed[s] . . . upon equitable principles." *The Kalfarli*, 277 F. 391, 394 (2d Cir. 1921) (citations omitted). Therefore, this Court will not rotely import the outstanding contractual balance as the basis for the bond in this case, as not doing so will not prejudice the plaintiff should it ultimately obtain an award in excess of the bond set.

11

¶ 5 (less than $61,000)), once the vessel was under arrest, this Court could have worked with the plaintiff and the defendants to find an alternative to keeping the vessel under arrest at a rate of $94 per day. *See* FED. R. CIV. P. 1 ("These rules[, including, necessarily, the Supplemental Admiralty Rules,] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."). But, prior to the instant motion, this issue was never brought to the Court's attention.

Finally, given the facts of this matter, the Court is not in a position to deny the substitute custodian the benefit of a fairly struck bargain where the plaintiff and the defendants have done nothing to mitigate the costs associated with the arrest of the vessel. In a related context, the court in *Louisiana International Marine, L.L.C. v. Drilling Rig Atlas Century*, C.A. No. C–11–186, 2011 WL 5027388 (S.D. Tex. Oct. 3, 2011), determined it was inequitable "to foist the unmitigated costs of detention on innocent Intervenors." *Id.* at *2. There, the court denied without prejudice the plaintiff's motion for per capita apportionment of custodianship fees ($607 per day), requesting that the intervening creditors of the vessel "share in the cost of keeping the vessel in the Marshal's care" because the plaintiff "never attempted to obtain a substitute custodian at lower cost." *Id.* at *1. The court reasoned:

> As the party paying for the impoundment of the Atlas Century, it is within Plaintiff's power to control custodial costs. Nevertheless, Plaintiff has not yet given any indication that it exercised diligence in mitigating the accrual of *custodial legis* expenses at any time after the Atlas Century's seizure. Plaintiff cannot complain about the high cost of custody when it has not even put forth the effort to research whether cheaper substitute custodians exist. Moreover, equity and good conscience do not

---

*Id.* (emphasis in original).

    countenance allowing Plaintiff to foist the unmitigated costs of detention on innocent Intervenors.   Until Plaintiff demonstrates that it has taken all reasonable steps to control the costs of custody, it cannot proceed with its attempt to apportion these expenses.

*Id.* at *2.

    Similarly, here, after the Court obtained jurisdiction over the vessel by virtue of its arrest, the plaintiff and the defendants could have moved for the release of the vessel on bond and, thus, could have mitigated the still accruing custodial fees.  Without taking such a reasonable step, the parties have, instead, asked this Court to, in essence, foist their unmitigated costs on an innocent substitute custodian.

### IV.   Conclusion.

    For the reasons stated above, the Court **GRANTS** the substitute custodian's motion (Doc. 33).   His expenses have been determined to be expenses *in custodia legis*. And the plaintiff and the defendants are ordered to pay ESM $7,953.66, plus $94 per day for every day after April 9, 2013, until the date upon which ESM delivers possession in accordance with further order of the Court.

    The parties are reminded that since this case has been reinstated (*see* Doc. 40), the applicable Rule 16(b) scheduling order (Doc. 26) remains in effect.   Pursuant to that order, all discovery is to be completed no later than August 16, 2013 and dispositive motions are to be filed no later than August 30, 2013.   (*See id.*, ¶¶ 2, 12.)

    **DONE and ORDERED** this the 14th day of June, 2013.

                                      s/WILLIAM E. CASSADY
                                      **UNITED STATES MAGISTRATE JUDGE**